FILED

2016 APR -6 P 2:49

CIVIL
DISTRICT COURT

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NO. 16 - 3468

DIVISION "  "

F-7

**GULF COAST BANK AND TRUST COMPANY**
*Plaintiff*

**VERSUS**

**DESIGNED CONVEYOR SYSTEMS, LLC**
*Defendant*

FILED:_____          _____
                                          **DEPUTY CLERK**

## PETITION

**NOW INTO COURT**, through undersigned counsel, comes Plaintiff, Gulf Coast Bank and Trust Company ("Gulf Coast"), which respectfully avers as follows:

### PARTIES

1.

Gulf Coast is a Louisiana state bank domiciled in the Parish of Orleans and licensed to do business in the State of Louisiana, with its principal place of business in Louisiana.

2.

Designed Conveyor Systems, LLC ("DCS"), is an Indiana limited liability company, licensed to do business in Louisiana, with a principal business establishment, registered office, and registered agent for service of process in the Parish of Baton Rouge.

### JURISDICTION AND VENUE

3.

Jurisdiction for this action is proper in the State of Louisiana pursuant to Article V of the Louisiana Constitution of 1974, Chapter 1 of Title 1 of the Louisiana Code of Civil Procedure, and Title 13 of the Louisiana Revised Statutes.

4.

Venue for this action is proper in the Parish of Orleans pursuant to Louisiana Code of Civil Procedure article 76.1.

///



EXHIBIT
"1"

## BACKGROUND

5.

On or around September 3, 2014, Vinex Global, LLC ("Vinex") entered into a Receivables Purchase Agreement ("RPA") with Gulf.  *See* RPA, attached as Exhibit A.

6.

Under the terms of the RPA, Vinex is entitled to offer for sale certain of its accounts receivables to Gulf Coast. *See generally id.* § 2.

7.

Upon the sale of Vinex's accounts receivables to Gulf Coast, Gulf Coast becomes full and absolute owner of those receivables. *See id.* § 2.1.1.

8.

On or around September 3, 2015, Vinex offered to sell and assign to Gulf Coast an invoice in the amount of $64,311.00 (the "invoice") owed by DCS to Vinex. *See* Letter from Carman Maurin, Account Executive of Gulf Coast, to Corey D. Fager, Treasurer of DCS (Sept. 3, 2015) ("Verification Agreement"), attached as Exhibit B; *see also* Invoice, attached as Exhibit C.

9.

On September 3, 2015, Gulf Coast sent a letter to DCS informing DCS that Vinex had requested Gulf Coast to accept an assignment of the invoice. *See* Verification Agreement.

10.

The Verification Agreement notified DCS that payment of the invoice was required to be made directly to Gulf Coast. *See id.*

11.

The Verification Agreement also requested DCS's "irrevocable acknowledgment that the invoice(s) described . . . [were] currently due in the amount indicated . . . , [and] represent[ed] payment for merchandise delivered and/or services rendered, **free of any defense, off-set, counterclaim, recoupment or any other limitation**." *See id.* (emphasis added).

12.

On or around September 17, 2015, DCS executed the Verification Agreement and returned it to Gulf Coast. *See id.*

/ / /

13.

As of October 10, 2015, the invoice was past due. *See* Invoice, attached as Exhibit C.

14.

On December 2, 2015, Gulf Coast, through its counsel, sent a letter ("First Demand Letter") to DCS demanding payment of the invoice within fifteen (15) days of the date of the letter. *See* Letter from Chad. P Morrow, Counsel for Gulf Coast, to Corey D. Fager, Treasurer of DCS (Dec. 2, 2015), attached as Exhibit D.

15.

In the First Demand Letter, Gulf Coast reserved its right to file suit against DCS for payment of the full amount due, attorney's fees, and legal interest. *See id.*

16.

Following receipt of the First Demand Letter, DCS, through its counsel, sent a letter to Gulf Coast to inform Gulf Coast that DCS refused to make the payments legally owed because of various defenses asserted against Vinex. *See* Letter from Alan T. Fister, Counsel for DCS, to Chad P. Morrow, Counsel for Gulf Coast (Dec. 4, 2015), attached as Exhibit E.

17.

On December 14, 2015, Gulf Coast, through its counsel, sent a second letter to DCS ("Second Demand Letter") informing DCS that the various defenses asserted against Vinex did not relieve DCS of its obligations under the Uniform Commercial Code ("UCC") and Verification Agreement to tender payment to Gulf Coast for the outstanding invoice. *See* Letter from Chad P. Morrow, Counsel for Gulf Coast, to Alan T. Fister, Counsel for DCS (Dec. 14, 2015), attached as Exhibit F.

18.

The Second Demand Letter also reiterated Gulf Coast's formal demand for payment of the outstanding invoice in accordance with the terms set forth in the First Demand Letter. *Id.*

19.

On December 16, 2015, DCS, through its counsel, sent a letter to Gulf Coast in which DCS again refused to tender payments legally owed to Gulf Coast because of DCS's alleged defenses against Vinex. *See* Letter from Alan T. Fister, Counsel for DCS, to Chad P. Morrow, Counsel for Gulf Coast (Dec. 16, 2015), attached as Exhibit G.

20.

On December 17, 2015, Gulf Coast, through its counsel, sent a third letter to DCS ("Third Demand Letter") again informing DCS that the various defenses asserted against Vinex did not relieve DCS of its obligations under the Uniform Commercial Code ("UCC") and Verification Agreement to tender payment to Gulf Coast for the outstanding invoice. *See* Letter from Chad P. Morrow, Counsel for Gulf Coast, to Alan T. Fister, Counsel for DCS (Dec. 17 2015), attached as Exhibit H.

21.

In the Third Demand Letter, Gulf Coast again reiterated its formal demand for payment of the outstanding balance in accordance with the terms set forth in the First and Second Demand Letters. Gulf Coast also informed DCS that Gulf Coast reserved its rights to exercise any and all rights and remedies available to it under applicable law. *See id.*

22.

To date, DCS has not satisfied any portion of the outstanding invoice owed to Gulf Coast.

## COUNT I – SUIT ON OPEN ACCOUNT

23.

Gulf Coast repeats the allegations in paragraphs 1-22 as though fully set forth herein.

24.

The unpaid amount of the invoice is $64,311.00, plus interest, and constitutes an open account under Louisiana Revised Statutes § 9:2781.

25.

Written demand for this open account was properly made upon mailing of the First Demand Letter on December 2, 2015, the Second Demand Letter on December 14, 2015, and the Third Demand Letter on December 17, 2015.

26.

DCS has failed to pay any amount owed to Gulf Coast. Because DCS has not made payment within thirty days from the date of written demand, Gulf Coast is entitled to judgment in its favor and against DCS pursuant to Louisiana Revised Statutes § 9:2781, including an award of reasonable attorneys' fees for the prosecution and collection of this claim.

27.

Further, pursuant to Louisiana Civil Code article 2000 and Louisiana Revised Statutes § 9:3500, Gulf Coast is entitled to interest from the date the invoice became due.

## COUNT II – BREACH OF CONTRACT

28.

Gulf Coast repeats the allegations in paragraphs 1-27 as though fully set forth herein.

29.

Gulf Coast and DCS executed the Verification Agreement on September 3 and 17, 2015 respectively.  Pursuant to the Verification Agreement, DCS irrevocably acknowledged that the invoice was due, represented payment for merchandise and/or services rendered, and was free of any defense, off-set, counterclaim, recoupment or any other limitation.  *See* Verification Agreement, attached as Exhibit B.

30.

DCS breached the Verification Agreement by failing to make payment on the invoice and by raising various defenses to payment of the invoice after expressly representing and warranting that no defense, off-set, counterclaim, recoupment, or any other limitation existed in connection with the outstanding invoice.

31.

Louisiana Civil Code articles 1994, *et seq.* provide this Court with authority to grant Gulf Coast damages arising from DCS's breach of the Verification Agreement.

## COUNT III – DETRIMENTAL RELIANCE

32.

Gulf Coast repeats the allegations in paragraphs 1-31 as though fully set forth herein.

33.

In the Verification Agreement, DCS represented and warranted to Gulf Coast that DCS had no defense, off-set, counterclaim, recoupment, or any other limitation to assert in connection with the payment of the outstanding invoice.

/ / /

/ / /

34.

DCS knew or should have known that those representations and warranties would induce Gulf Coast to rely on it to its detriment in deciding whether to purchase the invoice from Vinex.

35.

Gulf Coast relied on DCS's representations and warranties and acted reasonably in so doing.

36.

Under the Louisiana Civil Code, Gulf Coast is entitled to recover the expenses incurred or the damages suffered as a result of its reliance on DCS's representations and warranties.

**PRAYER FOR RELIEF**

**WHEREFORE**, Gulf Coast respectfully prays that Judgment be entered in its favor and against DCS for the entire amount of the obligations owed by DCS to Gulf Coast, together with pre-judgment interest from the date those obligations were due and post-judgment interest, costs, attorneys' fees, any and all foreseeable and unforeseeable damages sustained by Gulf Coast, and any other equitable and general relief the nature of this case allows.

Respectfully Submitted,

JAMES M. GARNER #19589
CHAD P. MORROW # 28695
DAVID A. FREEDMAN # 36463
**SHER GARNER CAHILL RICHTER
KLEIN & HILBERT, L.L.C.**
909 Poydras Street, Suite 2800
New Orleans, Louisiana  70112-4046
Telephone:  (504) 299-2100
Facsimile:  (504) 299-2300
E-Mail:      cmorrow@shergarner.com
             dfreedman@shergarner.com

**ATTORNEYS FOR GULF COAST
BANK AND TRUST COMPANY**

**Please Serve:**

DESIGNED CONVEYOR SYSTEMS, LLC
*Through its registered agent for service of process*:
National Registered Agents, Inc.
3867 Plaza Tower Dr.
Baton Rouge, Louisiana 70816

FILED

APR -6  P 2:49

## RECEIVABLES PURCHASE AGREEMENT

THIS RECEIVABLES PURCHASE AGREEMENT (the "Agreement") is made as of the ____ day of September, 2014, by and between VINEX GLOBAL, LLC (Texas Organizational Number: 802014045) ("Seller") and GULF COAST BANK AND TRUST COMPANY ("Purchaser").

1. **Definitions.** The following terms used herein shall have the following meaning. All capitalized terms not herein defined shall have the meaning set forth in the Uniform Commercial Code:

"**Accounts**" - any accounts, contract rights, chattel paper (electronic or written), notes, drafts, rental receivables, conditional sale contracts, general intangibles, payment intangibles, security agreements, installment paper, installment sales, revolving charge accounts, and other obligations for the payment of money, including inter-company accounts and notes receivable, and all documents, contracts, invoices and instruments evidencing or constituting the same and all security instruments and security agreements relating thereto, which are created, generated, acquired or otherwise owned by the Seller, all property the sale or lease of which gives rise or purports to give rise to Accounts, all related letter of credit rights, all accessory rights, and all cash and non-cash proceeds thereof, including any merchandise returned or rejected by, or repossessed from, Account Debtors.

"**Account Debtor**" - the obligor on an Account.

"**Accounts Transmittal**" - a form supplied (Schedule B) by Purchaser from time to time wherein Seller lists such of its Accounts as it requests that Purchaser purchase under the terms of this Agreement.

"**Accrual Termination Date**" – the date that is three (3) Business Days following the date on which Purchaser has collected, in cash, from the Account Debtor, or been paid by the Seller (by Reserve Account adjustment, Seller reimbursement or otherwise) an amount equal to the Purchaser Investment.

"**Business Day**"- any day that Purchaser is open for business at its offices in New Orleans, Louisiana.

"**Collateral**" - all now owned and hereafter acquired (i) accounts, chattel paper, other Accounts, Instruments (including promissory notes), investment property, documents, and general intangibles; including without limitation all reserve accounts, residual payments, credits and reserves, and letter of credit rights, (ii) all deposit accounts; (iii) all equipment and inventory, and (iv) all proceeds from any of the foregoing.

"**Eligible Account**" - an Account which is acceptable for purchase as determined by Purchaser in the exercise of its sole credit or business judgment.

"**Events of Default**" - See Section 12.1.

"**Face Amount**" - the amount shown as due on an Account.

"**Fixed Discount**" - (a) three quarters of one percent (0.75%) of the Face Amount of each Purchased Account, and (b) three quarters of one percent (0.75%) of the Face Amount of each Purchased Account for every fifteen (15) day period (or portion thereof) after the Fixed Discount Date that any portion of the Purchased Account remains unpaid.

Receivables Purchase Agreement          -1-



EXHIBIT

A

"**Fixed Discount Date**" — fifteen (15) days from the creation date of a Purchased Account.

"**Initial Payment**" — for each Purchased Account, the Net Face Amount less the Reserve Amount relating to that Purchased Account.

"**Initial Payment Date**" — with respect to any Purchased Account, the date on which the Initial Payment for such Account is paid.

"**Late Charge**" — two percent (2.00%) per month.

"**Late Payment Date**" - the date which is ninety (90) days from the date on which a Purchased Account was created.

"**Lockbox Address**" — the following address:     P.O. Box 731152
                                                   Dallas, TX 75373-1152

"**Maximum Amount**" - $500,000.00, less on each date of calculation, the Accounts of all outstanding Receivables that have been sold to GCBC by any Related Party on or before such date and which have not been fully paid by the account debtor thereunder or fully repurchased from GCBC.

"**Misdirected Payment Fee**" - fifteen percent (15%) of the amount of any payment on account of a Purchased Account which has been received by Seller and not delivered in kind to Purchaser on the next banking day following the date of receipt by Seller.

"**Missing Notation Fee**" — fifteen percent (15%) of the Face Amount.

"**Net Face Amount**" - the Face Amount of a Purchased Account, less all credits, discounts, and allowances to which the Account Debtor is entitled.

"**Notation**" - "This account has been assigned and is payable directly to Gulf Coast Bank and Trust Company, located at 200 St. Charles Avenue, New Orleans, Louisiana 70130. All payments should be made to Gulf Coast Bank and Trust Company at the following address: P.O. Box 731152, **Dallas, Texas 75373-1152**", or such other notation as may be required by Purchaser.

"**Obligations**" - all present and future obligations owing by Seller and/or any Related Party to Purchaser whether or not for the payment of money, whether or not evidenced by any note or other instrument, whether direct or indirect, absolute or contingent, due or to become due, joint or several, primary or secondary, liquidated or unliquidated, secured or unsecured, original or renewed or extended, whether arising before, during or after the commencement of any Bankruptcy Case in which Seller and/or Related Party is a Debtor, including but not limited to any obligations arising pursuant to letters of credit or acceptance transactions or any other financial accommodations; and all principal, interest, fees, charges, expenses, attorneys' fees and accountants' fees chargeable to Seller and/or Related Party or incurred by Purchaser in connection with this Agreement and/or the transaction(s) related thereto.

"**Purchase Price**" - the Face Amount less, without duplication, discounts, returns, credits or allowances of any nature at any time issued, owing, granted or outstanding.

"**Purchased Accounts**" - Accounts purchased hereunder which have not been Repurchased.

Receivables Purchase Agreement          -2-

"**Purchaser Investment**" - with respect to a Purchased Account, the sum of (i) the Initial Payment, plus (ii) all Fixed Discounts, Variable Discounts, fees and charges owed by Seller to Purchaser relating to the Purchased Account.

"**Related Party**" - Vinex Technology Partners, LLC

"**Related Party Documents**" - means the Receivable Purchase Agreement between Related Party and GCBC together with all amendments thereto and all documents executed in connection therewith, as well as all other documents executed in connection with any Obligations of Related Party of GCBC.

"**Repurchased**" - an Account has been repurchased when Seller has paid to Purchaser the then unpaid Face Amount, together with all other amounts, including Fixed Discounts and Variable Discounts, due with respect to such Account, upon demand by Purchaser under the terms hereof.

"**Required Reserve Amount**" - the Reserve Percentage multiplied by the unpaid balance of Purchased Accounts.

"**Reserve Account**" - a bookkeeping account on the books of the Purchaser representing an unpaid portion of the Purchase Price, maintained by Purchaser to ensure Seller's performance with the provisions hereof.

"**Reserve Amount**" - means the Net Face Amount of any Purchased Account, times the Reserve Percentage for such Purchased Account.

"**Reserve Percentage**" - ten percent (10.00%).

"**Reserve Shortfall**" - the amount by which the Reserve Account is less than the Required Reserve Amount.

"**Seller's Account**" - any demand deposit account maintained by Seller.

2. **Sale; Purchase Price; Billing; Reserve**

2.1 Assignment and Sale.

2.1.1 Seller shall offer to sell its Accounts to Purchaser as absolute owner, with full recourse, such Accounts to be listed from time to time on an Accounts Transmittal.

2.1.2 Each Accounts Transmittal shall be accompanied by such documentation supporting and evidencing the Account as Purchaser shall from time to time request.

2.1.3 Purchaser may purchase from Seller such Accounts as Purchaser determines to be Eligible Accounts in its sole discretion, so long as the unpaid balance of the Purchased Accounts does not exceed, before and after such purchase, the Maximum Amount.

2.1.4 Purchaser shall pay the Purchase Price, less any amounts due to Purchaser from Seller, including, without limitation, any amounts due under Section 2.3 hereof, of any Purchased Account, to Seller's Account within two (2) Business Days of Seller's receipt of an Accounts Transmittal,

Receivables Purchase Agreement         -3-

countersigned by Purchaser, whereupon the Accounts shall be deemed purchased hereunder.

2.1.5   The following shall apply in all cases in which the goods sold or services provided giving rise to a Purchase Account are provided by a third party (herein, a "Subcontractor"). In addition to Purchaser's set off and other rights hereunder, including its right to apply payments to the Reserve Account under Section 2.3, Purchaser shall have the right to apply the proceeds of any purchase of Purchased Accounts to the payment of amounts that may be due to one or more Subcontractors in connection with the Purchased Account, or in connection with any one or more Account subject to the security interests granted hereunder.  This right shall exist, whether or not the Subcontractor has lien rights or claims against the account debtor or any bonding company in connection with such goods or services, and whether or not the account debtor would hold set off or application rights with respect to the Purchased Account or Account if the Subcontractor is not paid by Seller.  Notwithstanding anything to the contrary contained herein, GCBC shall have the right to compromise or settle any Factored Receivable at any time without the consent of Company, and without affecting any other rights or remedies of GCBC under this Agreement.  Any such compromise or settlement will not affect any of the Obligations.

2.2   Billing. Purchaser may send a monthly statement to all Account Debtors itemizing their account activity during the preceding billing period.  All Account Debtors will be instructed to make payments to Purchaser.

2.3   Reserve Account.

2.3.1   Purchaser may apply a portion of any Purchase Price to the Reserve Account in the amount of the Reserve Shortfall.

2.3.2   Seller shall pay to Purchaser on demand the amount of any Reserve Shortfall.

2.3.3   Purchaser shall pay to Seller upon Seller's request, any amount by which collected funds in the Reserve Account are greater than the Required Reserve Amount; provided, that Seller shall be entitled to make such demand not more than twice in any one month.

2.3.4   Purchaser may charge the Reserve Account with respect to any Obligation, including any amounts due from Seller to Purchaser hereunder, in Purchaser's sole discretion and without prior notice to Seller.

2.3.5   Upon termination of this Agreement Purchaser may retain the Reserve Account (i) for ninety (90) days thereafter to be applied to payment of any Obligations that were unknown to Purchaser at the time of termination, and (ii) on a continuing basis thereafter until such time as Seller has executed and delivered to Purchaser a Release Agreement in the form of Schedule A hereto.

3.   Fees.  Seller shall pay to Purchaser:

3.1   Fixed Discount.  Seller shall pay to Purchaser a Fixed Discount, which shall accrue on each Purchased Account beginning on the Initial Payment Date up to and including the date that is three (3) business days following the date on which Purchaser has collected, in cash, from the Account Debtor, or been paid by the Seller (by Reserve Account adjustment, Seller reimbursement or otherwise) an amount equal to the Purchase Price (the final accrual date for a Purchased Account, the "Accrual

Termination Date").

3.2   Variable Discount. N/A

3.3   Misdirected Payment Fee.   Any Misdirected Payment Fee immediately upon its accrual.

3.4   Late Charge.   The Late Charge on:

3.4.1   all past due amounts due from Seller to Purchaser hereunder; and

3.4.2   the amount of any Reserve Shortfall.

3.5   Missing Notation Fee.   The Missing Notation Fee on any invoice that is sent by Seller to an Account Debtor which does not contain the Notation.

3.6   Out-of-pocket Expenses.   The out-of-pocket expenses directly incurred by Purchaser in the administration of this Agreement, such as wire transfer fees, postage and audit fees.

4.   Repurchase Of Accounts.

4.1   Purchaser may require that Seller repurchase, by payment of the unpaid Face Amount thereof together with any unpaid fees, Fixed Discounts or Variable Discounts relating to the Purchased Account on demand, or, at Purchaser's option, by Purchaser's charge to the Reserve Account, an of the following Purchased Accounts:

4.1.1   any Purchased Account, the payment of which has been disputed by the Account Debtor obligated thereon, Purchaser being under no obligation to determine the bona fides of such dispute;

4.1.2   all Purchased Accounts upon the occurrence of an Event of Default, or upon the termination date of this Agreement;

4.1.3   any Purchased Account which remains unpaid beyond the Late Payment Date;

4.1.4   any Purchased Account owing from an Account Debtor which, in the Purchaser's reasonable credit judgment, has become insolvent; and

4.1.5   any Purchased Account for which Seller has breached any representation or warranty under Section 11 hereunder.

4.2   Purchaser shall retain its security interest in any Purchased Account that has been repurchased by Seller.

4.3   Any repurchase of a Purchased Account under this Agreement shall be without recourse to Purchaser, and without any warranty or representation, express or implied, and Seller waives in connection with any retransfer any and all such warranties, including any warranties of presentment, transfer or otherwise, any warranty concerning the solvency of any Account Debtor under a Purchased Account, the existence of any right or the absence of any defenses to payment, under the Uniform Commercial Code, the Louisiana Civil Code, or otherwise.

Receivables Purchase Agreement        -5-

5.  Security Interest.

5.1  As collateral securing the Obligations, Seller grants to Purchaser a continuing first priority security interest in and to the Collateral.

5.2  Notwithstanding the creation of the above security interest, the relationship of the parties shall be that of Purchaser and Seller of accounts, and not that of lender and borrower.

6.  Intentionally Omitted.

7.  Authorization to Purchaser.

7.1  Seller hereby irrevocably authorizes Purchaser and any designee of Purchaser, at Seller's sole expense, to exercise at any times in Purchaser's or such designee's discretion all or any of the following powers until all of the Obligations have been paid in full: (a) receive, take, endorse, assign, deliver, accept and deposit, in the name of Purchaser or Seller, any and all cash, checks, commercial paper, drafts, remittances and other instruments and documents relating to the Collateral or the proceeds thereof, (b) take or bring, in the name of Purchaser or Seller, all steps, actions, suits or proceedings deemed by Purchaser necessary or desirable to effect collection of or other realization upon the accounts and other Collateral, (c) after an Event of Default, change the address for delivery of mail to Seller and to receive and open mail addressed to Seller, (d) after an Event of Default, extend the time of payment of, compromise or settle for cash, credit, return of merchandise, and upon any terms or conditions, any and all accounts or other Collateral which includes a monetary obligation and discharge or release any Account Debtor or other obligor, without affecting any of the Obligations, (e) execute in the name of Seller and file against Seller in favor of Purchaser financing statements or amendments with respect to the Collateral that (i) describe the Collateral; (ii) contain any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment; (iii) contain a notification that the Seller has granted a negative pledge to Purchaser, and agreed not to assign or encumber its Collateral, and that any subsequent lienor or claimant may be tortuously interfering with Purchaser's rights; and (iv) advises third parties that any notification of Seller's Account Debtors will interfere with Purchasers' collection rights, and (f) pay any sums necessary to discharge any lien or encumbrance which is senior to Purchaser's security interest in the Collateral, which sums shall be included as Obligations hereunder, and in connection with which sums the Late Charge shall accrue and be due and payable.

7.2  Seller hereby releases and exculpates Purchaser, its officers, employees and designees, from any liability arising from any acts under this Agreement or in furtherance thereof whether of omission or commission, and whether based upon any error of judgment or mistake of law or fact, except for willful misconduct. In no event will Purchaser have any liability to Seller for lost profits or other special or consequential damages.

8.  Covenants By Seller.

8.1  After written notice by Purchaser to Seller, and automatically, without notice, after an Event of Default, Seller shall not, without the prior written consent of Purchaser in each instance, (a) grant any extension of time for payment of any of the accounts or any other Collateral which includes a monetary obligation, (b) compromise or settle any of the accounts or any such other Collateral for less than the full amount thereof, (c) release in whole or in part any Account Debtor or other person liable for the payment of any of the accounts or any such other Collateral, or (d) grant any credits, discounts, allowances, deductions, return authorizations or the like with respect to any of the accounts or any such

other Collateral.

    8.2  Before sending any invoice evidencing an Account to the Account Debtor, Seller shall mark same with the Notation, or such other notation as Purchaser shall have advised Seller in writing.

    8.3  Seller shall pay when due all payroll and other taxes, and shall provide proof thereof to Purchaser in such form as Purchaser shall reasonably require.

    8.4  Seller shall not, without the prior written consent of Purchaser suffer to exist any lien (including any encumbrance or security interest) of any kind upon any of its assets, whether now owned or hereafter acquired, other than in favor of Purchaser.

    8.5  Seller shall maintain insurance on all insurable property owned or leased by Seller in the manner, to the extent and against at least such risks (in any event, including but not limited to fire and business interruption insurance) as usually maintained by owners of similar businesses and properties in similar geographic areas. All such insurance shall be in amounts and form and with insurance companies acceptable to Purchaser in its sole discretion. Seller shall furnish to Purchaser: (a) upon written request, any and all information concerning such insurance carried; (b) as requested by Purchaser, lender loss payable endorsements (or their equivalent) in favor of Purchaser. All policies of insurance shall provide for not less than thirty (30) days prior written cancellation notice to Purchaser.

    8.6  Notwithstanding that Seller has agreed to pay the Misdirected Payment Fee pursuant to Section 3.3 hereof, Seller shall deliver in kind to Purchaser on the next banking day following the date of receipt by Seller of the amount of any payment on account of a Purchased Account.

    8.7  The invoices related to all of the Accounts (whether or not Purchased Accounts) shall set forth the Lockbox Address as its sole address for payment. Seller shall establish a lock box (the "Lock Box") with Purchaser under Purchaser's exclusive control using the Lockbox Address and shall request in writing or otherwise take reasonable steps to ensure that all payments be sent directly to such Lock Box. Seller agrees that it will deposit or cause to be deposited promptly, and in any event no later than the first Business Day after the date of receipt thereof, all cash, checks, drafts or other similar items of payment relating to or constituting payments made in respect of any and all Collateral (whether or not otherwise delivered to a Lock Box) into the Lock Box, or in the case ACH wire transfers that it may receive, to immediately transfer such funds by wire transfer to a controlled account designated by Purchaser. With respect to collections on Accounts that are not Purchased Accounts (including Repurchased Accounts) and for which no amounts are owing to Purchaser, Purchaser is irrevocably authorized and empowered to apply any and all proceeds of collection of such Account received by Purchaser (at Purchaser's option, without obligation to do so) to the outstanding principal amount of, interest on, and other amounts owing in connection with the Obligations (in any order selected by Purchaser). Seller acknowledges and agrees (a) that all proceeds of collection of such Account by Purchaser will not be segregated by Purchaser and may be commingled with Purchaser's other funds, and (b) that Purchaser shall have no duty (fiduciary or otherwise) with respect to the proceeds of collection of such Accounts except as specifically provided for in this Agreement. If Purchaser either elects not to apply the proceeds of such collections to the Seller's Obligations, Purchaser may retain possession of such collections as additional Collateral; provided, however, that if no Event of Default has occurred, Purchaser shall release such collections to Seller at the written request of Seller within three (3) Business Days following the clearance of such payment item and its receipt of Seller's request.

    8.8  Seller acknowledges that payments with respect to Accounts may be delivered to the Lockbox Address following the termination of this Agreement and the full satisfaction of the Obligations

(such payments, the "Post-Termination Payments"). Seller further acknowledges that Purchaser shall have no liability whatsoever to Seller in connection with such Post-Termination Payments, and that Purchaser shall be entitled, following clearance of such payment item, to return any Post-Termination Payment directly to the maker of such Post-Termination Payment. The provisions of this Section 8.8 shall survive the expiration or earlier termination of this Agreement.

9.    **Account Disputes.** Seller shall notify Purchaser promptly of and, if requested by Purchaser, will settle all disputes concerning any Purchased Account, at Seller's sole cost and expense. However, Seller shall not, without Purchaser's prior written consent, compromise or adjust any Purchased Account or grant any additional discounts, allowances or credits thereon. Purchaser may, but is not required to, attempt to settle, compromise, or litigate (collectively, "Resolve") the dispute upon such terms as Purchaser in its sole discretion deem advisable, for Seller's account and risk and at Seller's sole expense. Upon the occurrence of an Event of Default, Purchaser may Resolve such issues with respect to any Account of Seller.

10.    **Perfection of Security Interest.** Seller shall execute and deliver to Purchaser such documents and instruments, including, without limitation, Uniform Commercial Code financing statements, as Purchaser may request from time to time in order to evidence and perfect its security interest in any collateral securing the Obligations.

11.    **Representations and Warranties.**

11.1    Seller represents and warrants that:

11.1.1    Seller shall immediately notify Purchaser in writing (i) upon it acquiring knowledge of any facts that would cause a Purchased Account to cease being an Eligible Account, (ii) of any material adverse change in Seller's financial condition or its businesses, and (iii) of any litigation or claims against Seller which could materially affect the Seller or its business operations, financial condition or prospects;

11.1.2    the Seller has good and indefeasible clear title to the Collateral, will convey clear title to all Purchased Accounts to Purchaser, and has the right, power and authority, subject to all applicable governmental regulations, to sell Purchased Accounts hereunder, and to grant a security interest in the Collateral to Purchaser;

11.1.3    the Collateral is not subject to, and is free and clear of, any lien, claim, pledge, security interest or encumbrance of any kind, other than those granted to Purchaser hereunder;

11.1.4    the Seller is properly licensed and authorized to operate its business under all applicable state and federal laws in the name designated for Seller on the signature page of this Agreement;

11.1.5    the Seller will not assign, pledge, subordinate, give a security interest in or otherwise transfer any Collateral to any entity other than Purchaser or its assigns;

11.1.6    this Agreement is binding upon Seller as well as upon Seller's successors, representatives and assigns, and is legally enforceable in accordance with its terms;

11.1.7    The Seller has conducted business under no name other than its name indicated herein, and uses no trade name or assumed name, excepts as follows:   none;

Receivables Purchase Agreement       -8-

11.1.8  Seller has not filed any petition under the Bankruptcy Code of the United States nor has any petition in bankruptcy been filed against Seller; no application for appointment of a receiver or trustee for all or a substantial part of Seller's property is pending; and Seller has made no assignment for the benefit of creditors; and

11.1.9  Seller shall not (a) be or become subject at any time to any law, regulation, or list of any government agency (including, without limitation, the U.S. Office of Foreign Asset Control list) that prohibits or limits Purchaser from making any advance or extension of credit to Seller or from otherwise conducting business with Seller, or (b) fail to provide documentary and other evidence of Seller's identity as may be requested by Purchaser at any time to enable Purchaser to verify Seller's identity or to comply with any applicable law or regulation, including, without limitation, Section 326 of the USA Patriot Act of 2001, 31 U.S.C. Section 5318.

11.2   The foregoing representations, covenants and warranties will run to the benefit of Purchaser's successors and assigns and will be continuing in nature and will remain in full force and effect until all obligations and sums owing to Purchaser by Seller have been fully performed, paid and satisfied, whether or not this Agreement is canceled or terminated.  Seller does hereby bind itself, its successors and assigns, to indemnify and hold Purchaser (and its successors and assigns) harmless from any and all cost incurred by Purchaser and its successors and assigns, including attorney's fees and court costs, for breach of any warranty expressed in this Section 11.

12.  Default.

12.1   Events of Default.  The following events will constitute an Event of Default hereunder: (a) Seller defaults in the payment of any Obligations, (b) Seller or any guarantor of the Obligations becomes subject to any debtor-relief proceedings, (c) any such guarantor fails to perform or observe any of such Guarantor's obligations to Purchaser or shall notify Purchaser of its intention to rescind, modify, terminate or revoke any guaranty of the Obligations, or any such guaranty shall cease to be in full force and effect for any reason whatever, (d) any Event of Default under the Related Party Documents, (e) Purchaser for any reason, in good faith, deems itself insecure with respect to the prospect of repayment or performance of the Obligations, (f) any default or anticipatory repudiation shall occur under or with respect to any guaranty executed in connection with the Obligations.

12.2   Effect of Default.

12.2.1  Upon the occurrence of any Event of Default, in addition to any rights Purchaser has under this Agreement or applicable law, Purchaser may immediately terminate this Agreement, at which time all Obligations shall become immediately become due and payable without notice.

12.2.2  The Late Charge shall accrue and be payable on demand on any Obligation not paid when due.

12.2.3  Purchaser may commence and effect collection of any and all Collateral by whatever means Purchaser deems reasonable and necessary, without recourse to judicial proceedings against Seller.

12.2.4  For purposes of foreclosure under Louisiana executory process procedures, Seller confesses judgment and acknowledges to be indebted unto and in favor of Purchaser, up to the full amount of the Obligations, in principal, interest, costs, expenses, attorneys' fees and other fees and charges.  To the extent permitted under applicable Louisiana law, Seller additionally waives: (a)

Receivables Purchase Agreement          -9-

the benefit of appraisal as provided in Articles 2332, 2336, 2723 and 2724 of the Louisiana Code of Civil Procedure, and all other laws with regard to appraisal upon judicial sale; (b) the demand and three (3) days' delay as provided under Article 2721 of the Louisiana Code of Civil Procedure; (c) the notice of seizure as provided under Articles 2293 and 2721 of the Louisiana Code of Civil Procedure; (d) the three (3) days' delay provided under Articles 2331 and 2722 of the Louisiana Code of Civil Procedure; and (e) all other benefits provided under Articles 2331, 2722 and 2723 of the Louisiana Code of Civil Procedure and all other Articles not specifically mentioned above.

13. **Termination; Effective Date.** This Agreement will be effective when accepted by Purchaser and will continue in full force and effect unless Seller or Purchaser shall give the other party at least ninety (90) days prior written notice of its intention to terminate. Upon termination Seller shall pay the Obligations to Purchaser, and Purchaser shall not purchase any Accounts from Seller. Such termination shall not affect the rights of the parties in connection with any Accounts purchased prior to such termination. Notwithstanding the foregoing, this Agreement may be terminated by Purchaser at any time without notice by Purchaser to Seller if an Event of Default shall occur. Notwithstanding anything to the contrary contained herein, the payment of a purchase price or any other advance by GCBC to the Company shall constitute GCBC's affirmative consent and agreement to the terms and conditions set forth in this Agreement, without the requirement that GCBC execute this Agreement.

14. **Indemnification and Release.**

14.1  Seller shall indemnify, defend and hold Purchaser and its successors and assigns harmless from and against all loss, claims and damages arising from (i) any breach of any warranty or representation hereunder; (ii) any action or inaction or liability of the Seller with respect to any Account, including any collection action, usury claim, violation of consumer credit, truth in lending, equal credit opportunity or unfair trade practice laws; or (iii) the manufacture, sale, possession or use of, or otherwise relating to, goods, or the performance of services, associated with or relating to any Account. Nothing herein shall constitute an assumption by Purchaser of any liability of the Seller under any Account, including any liability to deliver goods, render services, or to answer for any deficiencies with respect thereto, and Seller shall remain fully liable therefor.

14.2  Seller hereby releases and exculpates Purchaser, its officers, employees and designees, from any liability arising from any acts under this Agreement or in furtherance thereof whether of omission or commission, and whether based upon any error of judgment or mistake of law or fact, except for willful misconduct. In no event will Purchaser have any liability to Seller for lost profits or other special or consequential damages. Without limiting the generality of the foregoing, Seller releases Purchaser from any claims which Seller may now or hereafter have arising out of Purchaser's endorsement and deposit of checks issued by Seller's customers stating that they were in full payment of an account, but issued for less than the full amount which may have been owed on the account.

The provisions of this Section 14 shall survive the termination of this Agreement and the payment in full of the Obligations.

15. **Amendment.** Neither this Agreement nor any provisions hereof may be changed, waived, discharged or terminated, nor may any consent to the departure from the terms hereof be given, orally (even if supported by new consideration), but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought. Any waiver or consent so given shall be effective only in the specific instance and for the specific purpose for which given.

16. **No Lien Termination Without Release.** In recognition of the Purchaser's right to have its attorneys' fees and other expenses incurred in connection with this Agreement secured by the Collateral,

Receivables Purchase Agreement          -10-

notwithstanding payment in full of all Obligations by Seller, Purchaser shall not be required to record any terminations or satisfactions of any of Purchaser's liens on the Collateral unless and until Seller has executed and delivered to Purchaser a Release Agreement in the form attached as Schedule A.

17. **Severability.** In the event any one or more of the provisions contained in this Agreement is held to be invalid, illegal or unenforceable in any respect, then such provision shall be ineffective only to the extent of such prohibition or invalidity, and the validity, legality, and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

18. **Relationship of Parties.** The relationship of the parties hereto shall be that of Seller and Purchaser of accounts, and neither party is or shall be deemed a fiduciary of or to the other.

19. **Attorneys' Fees.** Seller agrees to reimburse Purchaser on demand for:

19.1 the actual amount of all costs and expenses, including attorneys' fees, which Purchaser has incurred or may incur in:

19.1.1 negotiating, preparing, or administering this Agreement and any documents prepared in connection herewith;

19.2 the actual costs, including photocopying (which, if performed by Purchaser's employees, shall be at the rate of $.10/page), travel, and attorneys' fees and expenses incurred in complying with any subpoena or other legal process attendant to any litigation in which Seller is a party;

19.3 either (the choice of which shall be in the sole discretion of Purchaser):

19.3.1 the actual amount of all costs and expenses, including attorneys' fees, which Purchaser may incur in enforcing this Agreement and any documents prepared in connection herewith, or in connection with any federal or state insolvency proceeding commenced by or against Seller, including those (a) arising out the automatic stay, (b) seeking dismissal or conversion of the bankruptcy proceeding or (c) opposing confirmation of Seller's plan thereunder.

19.3.2 twenty (20%) percent of the amount of the claim of Purchaser against Seller, which Seller agrees shall constitute a reasonable substitute for such actual fees and expenses.

20. **Entire Agreement.** This Agreement supersedes all prior or contemporaneous agreements and understandings between said parties, verbal or written, express or implied, relating to the subject matter hereof. No course of dealing, course of performance or trade usage, and no parol evidence of any nature, shall be used to supplement or modify any terms of this Agreement.

21. **Choice of Law.** This Agreement and all transactions contemplated hereunder and/or evidenced hereby shall be governed by, construed under, and enforced in accordance with the internal laws of the State of Louisiana.

22. **Jury Trial Waiver.** IN RECOGNITION OF THE HIGHER COSTS AND DELAY WHICH MAY RESULT FROM A JURY TRIAL, THE PARTIES HERETO WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING HEREUNDER, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY FURTHER WAIVES

ANY RIGHT TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

23.     **Jurisdiction; Venue.** The parties agree that any suit, action or proceeding arising out of the subject matter hereof, or the interpretation, performance or breach of this Agreement, shall, if Purchaser so elects, be instituted in the United States District Court for the Eastern District of Louisiana or any court of the State of Louisiana located in the Civil District Court for the Parish of Orleans (the "Acceptable Forums"), each party agrees that the Acceptable Forums are convenient to it, and each party irrevocably submits to the jurisdiction of the Acceptable Forums, irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement, and waives any and all objections to jurisdiction or venue that it may have under the laws of the State of Louisiana or otherwise in those courts in any such suit, action or proceeding. Should such proceeding be initiated in any other forum, Seller waives any right to oppose any motion or application made by Purchaser as a consequence of such proceeding having been commenced in a forum other than an Acceptable Forum.

24.  **Notice.**

24.1  All notices required to be given to any party other than Purchaser shall be deemed given upon the first to occur of:

24.1.1  deposit thereof in a receptacle under the control of the United States Postal Service;

24.1.2  transmittal by electronic means to a receiver under the control of such party; or

24.1.3  actual receipt by such party or an employee or agent of such party.

24.2  All notices required to be given to Purchaser hereunder shall be deemed given upon actual receipt by a responsible officer of Purchaser.

24.3  For the purposes hereof, notices hereunder shall be sent to the following addresses, or to such other addresses as each such party may in writing hereafter indicate:

| | | |
|---|---|---|
| (a) | If to Purchaser: | Gulf Coast Business Credit<br>1110 Highway 190, 2nd Floor<br>Covington, LA 70433<br>Phone No. 985-249-7200<br>Facsimile No. 985-898-3914 |
| (b) | If to Seller: | Vinex Global, LLC<br>5600 San Felipe, #4<br>Houston, TX 77056<br>Phone No. 832-277-0579<br>Facsimile No. _____ |

Receivables Purchase Agreement          -12-

25. **USA Patriot Act Notification.** The following notification is provided to Seller pursuant to Section 326 of the USA Patriot Act of 2001, 31 U.S.C. Section 5318:

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person or entity that opens an account, including any deposit account, treasury management account, loan, other extension of credit, or other financial services product. This will affect the Seller in several ways. When Seller opens an account, if Seller is an individual, Purchaser will ask for Seller's name, taxpayer identification number, residential address, date of birth, and other information that will allow Purchaser to identify Seller, and, if Seller is not an individual, Purchaser will ask for Seller's name, taxpayer identification number, business address, and other information that will allow Purchaser to identify Seller. Purchaser may also ask, if Seller is an individual, to see Seller's driver's license or other identifying documents, and, if Seller is not an individual, to see Seller's legal organizational documents or other identifying documents.

IN WITNESS WHEREOF, Purchaser and Seller have executed this Agreement on the day and year first above written.

PURCHASER:

GULF COAST BANK AND TRUST COMPANY

By: _____
Name:
Title:

SELLER:

VINEX GLOBAL, LLC

By: _____
Name:  Joy Burling
Title:   Member

ACKNOWLEDGMENT

UNITED STATES OF AMERICA
STATE OF _____*TEXAS*_____
COUNTY/PARISH OF _____*HAERIS*_____

On this *3RD* day of September, 2014, before me, a Notary Public duly qualified in and for the county/parish and state aforesaid, personally appeared Joy Burling, to me known, who being by me duly sworn, deposes and says that he/she resides at *5600 San Felipe Houston, TV*, that she signed the foregoing document as the free act of deed of Vinex Global, LLC (the "Company"), in her capacity as Owner of the Company pursuant to the authorization of the Company's members and managers, as the free act and deed of the Company, intending to be bound thereby.

IN TESTIMONY WHEREOF, I have hereunto set my hand in the State of _____*TEXAS*_____, County of _____*HAERIS*_____, on the *3RD* day of September, 2014.

_____
NOTARY PUBLIC
MY COMMISSION EXPIRES:

ALEX A PUENTES
NOTARY PUBLIC
STATE OF TEXAS
MY COMM. EXP. 08/02/2015

Receivables Purchase Agreement          -14-

Schedule A

RELEASE AGREEMENT

Vinex Global, LLC (the "Seller") has requested Gulf Coast Bank and Trust Company ("Purchaser") to terminate the Factoring Agreement (together with any amendments thereto, the "Agreement") between Purchaser and the Seller and the UCC-1 Financing Statement by the Seller in favor of Purchaser (the "Financing Statement"). The Seller has been provided with a statement concerning the estimated Obligations owed by the Seller under the Agreement, through the date referenced therein (the "Statement"). The Seller has requested Purchaser to agree to terminate the Agreement and the Financing Statement, upon Purchaser's receipt of payment in the amount stipulated in the Statement. Purchaser agrees to do so, provided that (a) you and your guarantor(s) agree to indemnify Purchaser for any dishonored or returned items (whether in whole or in part) for which credit was given in calculating the amount set forth in the Statement, by paying to Purchaser the amount of the dishonored or returned payment item (or, in the cases of partial dishonor, the amount that was not honored), within one (1) business day of receipt of notice from Purchaser to the Seller of the dishonor or return, (b) the Seller and its guarantor(s) further agree that should Purchaser be obligated to return any payment item in connection with any bankruptcy or insolvency proceeding, where the balance of the payment item was forwarded or credited to the Seller, or excluded from the balance of the Seller's Obligations in Purchaser's calculation of the payment amount due from the Seller under the Statement, that the Seller and its guarantor(s) will reimburse Purchaser for the amount that it is required to deliver with respect to the payment item in such bankruptcy or insolvency proceeding; and (c) that the Seller acknowledge that to the best of its knowledge, that Purchaser has performed its obligations under the Agreement, and that the Seller releases Purchaser from and against any claim or liability in connection with any act or failure to act of Purchaser under the Agreement, to the extent known to the Seller on the date hereof.

In accordance with the foregoing, Seller and its guarantor(s) agree as follows:

(i)     Seller and its guarantor(s) agree to indemnify Purchaser for any dishonored or returned items (whether in whole or in part) for which credit was given in calculating the amount set forth in the Statement, by paying to Purchaser the amount of the dishonored or returned payment item (or, in the cases of partial dishonor, the amount that was not honored), within one (1) business day of receipt of notice from Purchaser to the Seller of the dishonor or return;

(ii)    Seller and its guarantor(s) further agree that should Purchaser be obligated to return any payment item in connection with any bankruptcy or insolvency proceeding, where the balance of the payment item was forwarded or credited to the Seller, or excluded from the balance of the Seller's Obligations in Purchaser's calculation of the payment amount due from the Seller under the Statement, that the Seller and its guarantor(s) will reimburse Purchaser for the amount that it is required to deliver with respect to the payment item in such bankruptcy or insolvency proceeding; and

(iii)   Seller acknowledges that to the best of its knowledge, that Purchaser has performed its obligations under the Agreement, and that the Seller releases Purchaser from and against any claim or liability in connection with any act or failure to act of Purchaser under the Agreement, to the extent known to the Seller on the date hereof.

Seller acknowledges that nothing herein shall be deemed to release the Seller or its guarantors from any Obligations that are not fully paid and performed, and that Seller (and its guarantors, to the extent provided in the applicable guaranty of the guarantors), shall remain fully liable for the full payment of all Obligations when due. Please indicate your consent to the foregoing by signing where indicated below.

Date:

SIGNATURES OF SELLER AND GUARANTORS

Receivables Purchase Agreement          -15-

SCHEDULE B
FORM OF A/R REPORT

**Receivables Assigned to Gulf Coast Business Credit (a division of Gulf Coast Bank and Trust Company)**

Customer Name: Vinex Global, LLC               Date:

Schedule Num.:                 Page Number:                 Total Pages:

| Invoice # | Date | Customer's Name | Address | Gross Invoice |
|-----------|------|-----------------|---------|---------------|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  | TOTAL |  |

*Attach a copy of the original invoice along with proof of completion and/or delivery of order.*

The undersigned, for value received, hereby sells, assigns, transfers and sets over to Gulf Coast Business Credit, the above listed invoices, in accordance with the terms and conditions recited in a certain Receivables Purchase Agreement executed by the undersigned with Gulf Coast Business Credit. Further, that all materials have been delivered and all services performed as represented on the above listed invoices, and that there are no existing offsets.

_____                    _____
(Company Name)                             (Authorized Signature)

Receivables Purchase Agreement        -16-



**GULF COAST BUSINESS CREDIT**
**DIVISION OF GULF COAST BANK & TRUST COMPANY**

September 3, 2015

Designed Conveyor Systems, LLC
1886 General George Patton Dr.
Franklin, TN 37067
Email: Corev.Fager@DiakoniaGroup.com; crystal.gress@diakoniagroup.com;
accounting@dcsmailbox.com; cfager@diakoniagroup.com; cmorton@dcsmailbox.com

<u>**This is not a request for payment. Please fax back your response.**</u>

RE:     Invoice Acknowledgment Agreement

Dear Accounts Payable Supervisor:

Vinex Global has requested that Gulf Coast Bank & Trust Company ("GCB") accept an assignment of the invoice(s) listed below (the "Invoice(s)") in order to extend financial accommodations secured by a collateral assignment of its accounts receivable.  Accordingly, payment of the invoice(s) listed below and any future invoices must be made directly to GCB at:

| Mailing Instructions: | ACH Instructions: |
|---|---|
| Gulf Coast Bank & Trust Company | Gulf Coast Bank & Trust Company |
| For the account of Vinex Global | New Orleans, LA 70130 |
| P.O. Box 731152 | ABA #265070435 |
| Dallas, TX 75373-1152 | Account #100266964 |
| | Re: Vinex Global |

We request your irrevocable acknowledgment that the invoice (s) described herein are currently due in the amount indicated below, represents payment for merchandise delivered and/or services rendered, free of any defense, off-set, counterclaim, recoupment or any other limitation.  The invoice(s) are:

| Date | Invoice # | Amount | Comments/Expected Payment Date |
|---|---|---|---|
| 09/03/15 | 1289 | $64,311.00 | |

Feel free to contact us should you have any questions regarding this letter agreement.  Please fax to **(832) 201-9289** or e-mail to carmanmaurin@gulfbank.com .  Thank you for your prompt response.

Kind Regards,
Carman Maurin

<u>*ACCEPTED AND AGREED TO:*</u>
Vinex Global
*Authorized Signer*
By signing below, you hereby confirm that you meet at least one of the following authorization criteria:  (I) have the authority to issue checks for payment of the invoice(s); (II) have the authority to approve the invoice(s) for payment; or (III) are a Vice President or Treasurer, or other fiscal officer of the company hereby represented.

By: _____     Title: _Treasurer_____

Print Name: _Corey D. Fager___     Date: _9/17/15___

**EXHIBIT**
**B**

VINEX GLOBAL, LLC
PO Box 840025
Houston, TX 77284 US
ayoakum@vinextech.com

*Vinex Global*

# INVOICE

BILL TO
Designed Conveyor Systems,
LLC
1888 General George Patton Dr
Franklin, TN 37067

INVOICE # 1289
DATE 09/02/2015
DUE DATE 10/02/2015
TERMS Net 30

P.O. NUMBER
57699-00

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| Services<br>Milestone #1 - Upon Mobilization | 0 | 95,467.00 | 0.00 |
| Services<br>Milestone #2 - July Invoice | 0 | 64,311.00 | 0.00 |
| Services<br>Milestone #3 - August Invoice | 0 | 64,311.00 | 0.00 |
| Services<br>Milestone #4 - September Invoice | 1 | 64,311.00 | 64,311.00 |
| Service Collection Fee<br>Milestone #5 - System Acceptance and As-Built Completion | 0 | 92,157.00 | 0.00 |

Remit Payment To: Gulf Coast Business Credit
PO Box 731152
Dallas, TX 75373-1152

**BALANCE DUE**          **$64,311.00**

Physical Address:  Vinex Global
5600 San Felipe Unit 4
Houston, TX 77056

EXHIBIT
C

LAW OFFICES OF

# SHER GARNER CAHILL RICHTER
# KLEIN & HILBERT, L.L.C.

TWENTY-EIGHTH FLOOR
909 POYDRAS STREET
NEW ORLEANS, LOUISIANA 70112-4046
http://www.shergarner.com

LEOPOLD Z. SHER[1]
JAMES M. GARNER[2]
ELWOOD F. CAHILL, JR.
RICHARD P. RICHTER
STEVEN I. KLEIN[1,7]
PETER L. HILBERT, JR.
MARIE A. MOORE[2]
DEBRA J. FISCHMAN
ROBERT P. THIBEAUX
DARNELL BLUDWORTH[2]
MARTHA Y. CURTIS[2]
NEAL J. KLING
JOSHUA S. FORCE[3,4]
DEBORAH J. MOENCH
DOROTHY S. WATKINS LAWRENCE[2]
JOHN T. BALHOFF, II
ALVIN C. MIESTER, III
CHRISTOPHER T. CHOCHELES

RYAN D. ADAMS
THOMAS J. MADIGAN, II[5]
CHAD P. MORROW
KEVIN M. McGLONE
JEFFREY D. KESSLER[6]
RYAN C. LUMINAIS[5]
KAREN T. HOLZENTHAL
JONATHAN B. CERISE
ASHLEY G. COKER
AMANDA RUSSO SCHENCK
MELISSA ROME HARRIS
MARY BETH AKIN
JENNIFER H. MABRY
CHRISTINA PECK SAMUELS
JACOB A. AIREY
ERIC J. BLEVINS
JOSHUA P. CLAYTON
MEGAN TAYLOR JAYNES

EMILY E. ROSS
PETER J. SEGRIST
TRAVIS A. BEATON
REBEKKA C. VEITH
DAVID A. FREEDMAN
STEPHANIE E. HOLDEN
BRANDON W. KEAY
ELIZABETH B. McINTOSH

SPECIAL COUNSEL:
MATTHEW M. COMAN

OF COUNSEL:
TIMOTHY B. FRANCIS
DAVID A. MARCELLO

[1] LAW CORPORATION
[2] MEMBER OF LOUISIANA AND TEXAS BARS
[3] MEMBER OF LOUISIANA AND ALABAMA BARS
[4] MEMBER OF LOUISIANA AND CALIFORNIA BARS
[5] MEMBER OF LOUISIANA AND MISSISSIPPI BARS
[6] MEMBER OF LOUISIANA AND NEW YORK BARS
[7] BOARD CERTIFIED TAX ATTORNEY LOUISIANA
     BOARD OF LEGAL SPECIALIZATION

ALL OTHERS LOUISIANA BAR

cmorrow@shergarner.com
Direct Dial: (504) 299-2129
Direct Fax: (504) 299-2329

(504) 299-2100
FAX (504) 299-2300

December 2, 2015

**Via Federal Express and**
**Via email: corey.fager@diakoniagroup.com**
Designed Conveyor Systems, LLC
Attn: Corey D. Fager, Controller
830 Crescent Centre Dr., Suite 550
Franklin, TN 37067

Re:   Gulf Coast Bank and Trust Company/Vinex Global, LLC
      Our File No. 20100.1473

Dear Mr. Fager:

        We serve as counsel for Gulf Coast Bank and Trust Company (the "Bank"). The Bank
has entered into factoring agreement with Vinex Global, LLC ("Vinex") in which it has
purchased certain outstanding receivables of Vinex, including accounts receivable from
Designed Conveyor Systems, LLC ("Account Debtor"). Reference is specifically made to
Invoice No. 1289 dated 9/2/2015 in the amount of $64,311.00 (the "Overdue Account"). A copy
of the invoice is attached for your convenience.

        Prior to the purchase by the Bank of the Overdue Account, the Account Debtor was
contacted to verify the amount of the invoice, as well as the absence of any defenses to payment
or rights of set off, and was notified of the assignment to the Bank of the invoice.
Representatives of Account Debtor provided written assurances to the Bank that the amount
stipulated in the Overdue Account was due and that Account Debtor had no defenses to the



EXHIBIT
D

LAW OFFICES OF

# SHER GARNER CAHILL RICHTER
# KLEIN & HILBERT, L.L.C.

December 2, 2015
Page - 2 -

payment of the Overdue Account, or rights of set off. A copy of the signed verification letter is attached for your reference. The Bank has therefore detrimentally relied on representations made by the Account Debtor in purchasing this invoice.

As assignee of the Overdue Account, the Bank is authorized to take such actions as it deems necessary to collect the sums due under the Overdue Account. The Bank is concerned that the delinquency of the outstanding balance of the Overdue Account has reached a level requiring attention from outside counsel. If the outstanding balance due under this invoice has not been paid to the Bank, please remit payment to the Bank at the address set forth on the notification letter previously provided to you. If the full amount of this invoice has been paid to the Bank and the check for such payments have cleared, please provide the Bank with a copy of your cancelled check.

This letter shall constitute formal demand for payment of the outstanding balance of the Overdue Accounts within fifteen (15) days of the date of this letter. If the Bank does not receive full payment of these invoices within such fifteen (15) day period, the Bank reserves its right to file suit against you for payment of the full amount due under the Overdue Accounts plus attorney's fees. Legal interest is also accruing on this invoice until paid.

If you have any questions concerning the foregoing, please feel free to contact either myself or Ms. Minaxi Chase, the Vice President of Gulf Coast Business Credit.

Sincerely,

Chad P. Morrow

cc:    Ms. Minaxi Chase (via email)

ALAN T. FISTER
ATTORNEY AT LAW
THE CHAPPLE BUILDING
5115 MARYLAND WAY, SUITE 301
BRENTWOOD, TN 37027
OFFICE: (615) 376-9800
DIRECT: (615) 376-0175
FAX: (615) 376-9555
afister@brentwoodlaw.com

December 4, 2015

Chad P. Morrow
Sher, Garner, et al.
Twenty-Eighth Floor
909 Poydras Street
New Orleans, LA 70112-4046

VIA FAX: 504-299-2329

Re: Gulf Coast Bank and Trust Company/Vinex Global, LLC
Your File No. 20100.1473

Dear Mr. Morrow,

I am counsel for Designed Conveyor Systems, LLC ("DCS"). We are in receipt of your letter dated December 2, 2015. In order to fully assess the claims of your client, we need a copy of the documents related to the alleged assignment of the accounts payable from Vinex Global to Gulf Coast Bank. We also need documentation to support when and if actual advances were made by Gulf Coast Bank related to Invoice 1289.

I reviewed the September 3, 2015, document signed by DCS. We deny that Gulf Coast Bank relied to its detriment on said letter. Even assuming, *arguendo*, that the September 3, 2015, document was relied upon; I note that DCS does not waive rights for DCS to implement "cover" damages pursuant to section 7 of its contract. If your client performed its due diligence, it should have a copy of the June 19, 2015, subcontract agreement.



As you may know, Vinex without justification and without advance notice walked off of the job on October 16, 2015. This action, together with other conduct of Vinex, constitutes material breaches of contract. DCS has been required to hire replacement contractors to finish the job. Per the contract, the "cover" damages incurred by DCS are deducted from any amounts arguably owed to Vinex under the contract. DCS has filed suit against Vinex for its material breaches of contract.

Even assuming, *arguendo,* that the September 3, 2015, document is effective; that representation is valid only as of September 3, 2015, and does not affect the contractual remedies of DCS for Vinex conduct after September 3. Therefore, I respectfully request that you withdraw your December 2, 2015, demand letter. After DCS has completed the job and assessed all "cover" damages, we will advise as to whether there are any amounts remaining to be paid Vinex. Please give me the benefit of a prompt reply.

Sincerely,

Alan T. Fister

LAW OFFICES OF

# SHER GARNER CAHILL RICHTER KLEIN & HILBERT, L.L.C.

TWENTY-EIGHTH FLOOR
909 POYDRAS STREET
NEW ORLEANS, LOUISIANA 70112-4046
http://www.shergarner.com

LEOPOLD Z. SHER [1]
JAMES M. GARNER [2]
ELWOOD F. CAHILL, JR.
RICHARD P. RICHTER
STEVEN I. KLEIN [1,7]
PETER L. HILBERT, JR.
MARIE A. MOORE [6]
DEBRA J. FISCHMAN
ROBERT P. THIBEAUX
DARNELL BLUDWORTH [2]
MARTHA Y. CURTIS [2]
NEAL J. KLING
JOSHUA S. FORCE [2,4]
DEBORAH J. MOENCH
DOROTHY S. WATKINS LAWRENCE [2]
JOHN T. BALHOFF, II
ALVIN C. MIESTER, III
CHRISTOPHER T. CHOCHELES

RYAN D. ADAMS
THOMAS J. MADIGAN, II [6]
CHAD P. MORROW
KEVIN M. McGLONE
JEFFREY D. KESSLER [5]
RYAN O. LUMINAIS [6]
KAREN T. HOLZENTHAL
JONATHAN B. CERISE
ASHLEY G. COKER
AMANDA RUSSO SCHENCK
MELISSA ROME HARRIS
MARY BETH AKIN
JENNIFER H. MABRY
CHRISTINA PECK SAMUELS
JACOB A. AIREY
ERIC J. BLEVINS
JOSHUA F. CLAYTON
MEGAN TAYLOR JAYNES

EMILY E. ROSS
PETER J. SEGRIST
TRAVIS A. BEATON
REBEKKA C. VEITH
DAVID A. FREEDMAN
STEPHANIE E. HOLDEN
BRANDON W. KEAY
ELIZABETH B. McINTOSH

SPECIAL COUNSEL:
MATTHEW M. COMAN

OF COUNSEL:
TIMOTHY B. FRANCIS
DAVID A. MARCELLO

[1] LAW CORPORATION
[2] MEMBER OF LOUISIANA AND TEXAS BARS
[3] MEMBER OF LOUISIANA AND ALABAMA BARS
[4] MEMBER OF LOUISIANA AND CALIFORNIA BARS
[5] MEMBER OF LOUISIANA AND MISSISSIPPI BARS
[6] MEMBER OF LOUISIANA AND NEW YORK BARS
[7] BOARD CERTIFIED TAX ATTORNEY LOUISIANA
     BOARD OF LEGAL SPECIALIZATION

ALL OTHERS LOUISIANA BAR

cmorrow@shergarner.com
Direct Dial: (504) 299-2129
Direct Fax: (504) 299-2329

(504) 299-2100
FAX (504) 299-2300

December 14, 2015

**Via Federal Express,**
**Via Facsimile: 615-376-9555, and**
**Via email: afister@brentwoodlaw.com**
Alan T. Fister, Attorney At Law
The Chapple Building
5115 Maryland Way, Suite 301
Brentwood, TN 37027

Re:   Gulf Coast Bank and Trust Company/Vinex Global, LLC
       Our File No. 20100.1473

Dear Mr. Fister:

As you know, we serve as counsel for Gulf Coast Bank and Trust Company (the "Bank"). We are in receipt of your letter dated December 4, 2015. In response to your request for documents relating to the assignment by Vinex Global, LLC ("Vinex") to the Bank, please see attached a copy of the Receivables Purchase Agreement executed between the Bank and Vinex.

In asserting your client's refusal to pay the amounts legally owed to the Bank, your letter ignores the plain language of the UCC and the clear terms of the verification letter dated September 3, 2015 (the "Verification Letter"), a copy of which was previously provided to your client, Designed Conveyor Systems, LLC ("DCS"). A copy of the Verification Letter is also attached hereto for your reference.



EXHIBIT
F

December 14, 2015
Page - 2 -

First, the Bank will not provide – and is not obligated to provide – to DCS evidence that actual advances were made by the Bank to Vinex. Section 9-406 of the UCC provides that

> "an account debtor on an account…may discharge its obligation by paying the assignor until, **but not after,** the account debtor receives a notification, authenticated by the assignor or the assignee, that the amount due or to become due has been assigned and that payment is to made to the assignee. After receipt of the notification, the account debtor may discharge its obligation by paying the assignor." [emphasis added]

The UCC does not obligate the assignee to deliver evidence to the account debtor that any advance was made by the assignee to the assignor as a condition to the account debtor's obligation to pay the assignee. Indeed, this is entirely logical since an account debtor may assign an account in a context that does not necessarily give rise to a monetary advance that specifically accompanies the assigned account. Accordingly, following DCS's receipt of the notification, it could discharge its obligation only by paying the Bank, without the right to require evidence that any advance was actually made by the Bank to Vinex.

Your letter goes on to state that DCS "den[ies] that [the Bank] relied to its detriment on" the Verification Letter. We find it odd that DCS – or any third party for that matter – believes it is capable of commenting on whether or not *the Bank* relied on the Verification Letter. Your letter does not present any evidence for such a bizarre statement. To the extent you have such evidence, please send it to us.

Your letter then asserts that DCS does not specifically waive its rights to collect so-called "cover damages" under its contract with Vinex. By executing the Verification Letter, DCS acknowledged that Invoice No. 1289 was due in the amount indicated, "free of **any defense, off-set, counterclaim, recoupment or any other limitation** (emphasis added)." The Bank is not required to review DCS's contract with Vinex as a condition to the effectiveness of the assignment. And we are not familiar the terms of the contract. But it is quite a stretch of language to state that these "cover damages," which your letter states are "deducted" from amounts owed to Vinex, do not constitute a "defense, off-set, counterclaim, recoupment or any other limitation."

Your letter further recounts that Vinex failed to comply with its obligations under its contract with DCS. We again direct your attention to terms of the Verification Letter. By executing the Verification Letter, DCS acknowledged that Invoice No. 1289 is "currently due in the amount indicated [in the Verification Letter], represents payment for **merchandise delivered**

LAW OFFICES OF

# SHER GARNER CAHILL RICHTER
# KLEIN & HILBERT, L.L.C.

December 14, 2015
Page - 3 -

and/or services rendered..." (emphasis added).   Simply put, if Vinex did not perform its obligations under Invoice No. 1289, DCS should not have executed the Verification Letter. DCS may have a separate claim against Vinex for Vinex's failure to perform its obligations.  But in deciding to execute the Verification Letter, DCS caused the Bank to detrimentally rely on the representations and warranties set forth therein.

You also assert that any representation made by DCS in the Verification Letter "is valid only as of September 3, 2015, and does not affect the contractual remedies of DCS for Vinex conduct after September 3." First, as set forth above, DCS expressly represented to the Bank in the Verification Letter that all services of Vinex had been performed.  If that was not accurate, DCS may have a claim against Vinex.  But that in no way limits the clear representation made by DCS to the Bank in the Verification Letter and DCS is not relieved of its obligation to pay the Bank.   Second, your letter appears to suggest that any representation made by DCS in the Verification Letter was actionable by the Bank on, and only on, September 3. There is nothing, however, in the language of the Verification Letter that would lead to such an interpretation.

By this letter, the Bank reiterates its formal demand for payment of the outstanding balance of the Overdue Accounts in accordance with the terms set forth in our prior correspondence.

If you have any questions concerning the foregoing, please feel free to contact either myself or Ms. Minaxi Chase, the Vice President of Gulf Coast Business Credit.

Sincerely,

Chad P. Morrow

cc:    Ms. Minaxi Chase (via email)

ALAN T. FISTER
ATTORNEY AT LAW
THE CHAPPLE BUILDING
5115 MARYLAND WAY, SUITE 301
BRENTWOOD, TN 37027
OFFICE: (615) 376-9800
DIRECT: (615) 376-0175
FAX: (615) 376-9555
afister@brentwoodlaw.com

December 16, 2015

**VIA FACSIMILE:**              **(504) 299-2329**

Mr. Chad Morrow
Sher, Garner, et al.
Twenty eighth floor
909 Poydras St.
New Orleans, LA 70112

          Re:   Gulf Coast Bank/Vinex Global

Dear Mr. Morrow:

          I am in receipt of your letter dated December 14, 2015. Thank you for a
copy of the Receivables Purchase Agreement. I would also appreciate a copy of
the UCC-1 to determine whether the bank ever perfected a security interest. I note
that the document was <u>never signed</u> by Gulf Coast Bank. Thus, on its face it
appears unenforceable. Even assuming, *arguendo,* that the Agreement is
enforceable, it <u>only</u> applies to accounts listed on a valid Accounts Transmittal, per
section 2.1.1. Naturally, my client respectfully demands to see the Accounts
Transmittal document which allegedly assigned this particular account months
ago, if one exists.

          In any event, per general law, an assignee of an obligation can acquire no
greater rights than his assignor had. An assignee is subject to all defenses against
it that would have been proper against the assignor. This general law has not been
changed by the UCC. Per UCC 9-403 and 9-404, the assignment of claims, such
as the purported accounts receivable assignment from Vinex to Gulf Coast Bank,
are subject to all defenses that my client Designed Conveyor Systems, LLC,
("DCS") might have against the assignor Vinex. The only exception to this is
found at Tenn. Code Ann. §47-9-403, when there exists "an agreement between an



EXHIBIT
G

account debtor and an assignor not to assert against an assignee any claim or defense... ." [emphasis supplied].

In our case, there is no agreement whatsoever between DCS and Vinex whereby DCS agreed to waive any claim or defense it may have.  In fact, Section 15 of the contract specifically prohibits Vinex from assigning payments. Gulf Coast Bank was aware of this provision, or should have been aware of this provision if the bank performed proper due diligence.  The DCS representative that allegedly on September 17, 2015, signed the bank form did not have authority to revise Vinex contract provisions.  The Vinex contract clearly prohibits assignment of payments; and it allows for the recovery of "cover" damages for breach by Vinex.  It would take an amendment of contract for Vinex to legally factor this invoice to your client, and no such amendment occured.   It is also interesting that the attorney for Vinex is trying to settle our litigation by asking for payment to Vinex of the same invoice that Gulf Coast Bank is concurrently seeking payment for. In sum, under black letter law and the UCC, Gulf Coast Bank does not have standing as a holder in due course, or any similar standing that would defeat the right of DCS to recover its post September 17, 2015, "cover" damages against all Vinex invoices.

As I explained in my previous letter, Vinex improperly and unlawfully walked off the job, and DCS was required to retain other contractors to perform the work that Vinex should have done.  Therefore, DCS is entitled to obtain its "cover" damages against Vinex; including its assignee, Gulf Coast Bank. This is demand that your client Gulf Coast withdraw any assertion that DCS is obligated to pay any monies whatsoever to Gulf Coast Bank. In the event that the "cover" damages are less than obligations owed to Vinex, then it may be possible for DCS to pay Gulf Coast Bank a sum certain. However, DCS is not yet certain of all of its "cover" damages.

Sincerely,

Alan T. Fister

LAW OFFICES OF

# SHER GARNER CAHILL RICHTER
# KLEIN & HILBERT, L.L.C.

TWENTY-EIGHTH FLOOR
909 POYDRAS STREET
NEW ORLEANS, LOUISIANA 70112-4046
http://www.shergarner.com

LEOPOLD Z. SHER [1]
JAMES M. GARNER [2]
ELWOOD F. CAHILL, JR.
RICHARD P. RICHTER
STEVEN I. KLEIN [1,7]
PETER L. HILBERT, JR.
MARIE A. MOORE [3]
DEBRA J. FISCHMAN
ROBERT P. THIBEAUX
DARNELL BLUDWORTH [2]
MARTHA Y. CURTIS [2]
NEAL J. KLING
JOSHUA S. FORCE [2,4]
DEBORAH J. MOENCH
DOROTHY S. WATKINS LAWRENCE [2]
JOHN T. BALHOFF, II
ALVIN C. MIESTER, III
CHRISTOPHER T. CHOCHELES

RYAN D. ADAMS
THOMAS J. MADIGAN, II [5]
CHAD P. MORROW
KEVIN M. McGLONE
JEFFREY D. KESSLER [6]
RYAN O. LUMINAIS [3]
KAREN T. HOLZENTHAL
JONATHAN B. CERISE
ASHLEY G. COKER
AMANDA RUSSO SCHENCK
MELISSA ROME HARRIS
MARY BETH AKIN
JENNIFER H. MABRY
CHRISTINA PECK SAMUELS
JACOB A. AIREY
ERIC J. BLEVINS
JOSHUA P. CLAYTON
MEGAN TAYLOR JAYNES

EMILY E. ROSS
PETER J. SEGRIST
TRAVIS A. BEATON
REBEKKA C. VEITH
DAVID A. FREEDMAN
STEPHANIE E. HOLDEN
BRANDON W. KEAY
ELIZABETH B. McINTOSH

SPECIAL COUNSEL:
MATTHEW M. COMAN

OF COUNSEL:
TIMOTHY B. FRANCIS
DAVID A. MARCELLO

[1] LAW CORPORATION
[2] MEMBER OF LOUISIANA AND TEXAS BARS
[3] MEMBER OF LOUISIANA AND ALABAMA BARS
[4] MEMBER OF LOUISIANA AND CALIFORNIA BARS
[5] MEMBER OF LOUISIANA AND MISSISSIPPI BARS
[6] MEMBER OF LOUISIANA AND NEW YORK BARS
[7] BOARD CERTIFIED TAX ATTORNEY LOUISIANA
    BOARD OF LEGAL SPECIALIZATION

ALL OTHERS LOUISIANA BAR

cmorrow@shergarner.com
Direct Dial: (504) 299-2129
Direct Fax: (504) 299-2329

(504) 299-2100
FAX (504) 299-2300

December 17, 2015

**Via Federal Express,**
**Via Facsimile: 615-376-9555, and**
**Via email: afister@brentwoodlaw.com**
Alan T. Fister, Attorney At Law
The Chapple Building
5115 Maryland Way, Suite 301
Brentwood, TN 37027

Re:   Gulf Coast Bank and Trust Company/Vinex Global, LLC
      Our File No. 20100.1473

Dear Mr. Fister:

As you know, we serve as counsel for Gulf Coast Bank and Trust Company (the "Bank"). We are in receipt of your letter dated December 16, 2015.

We first address the claims set forth in the initial paragraph of your letter, which misinterpret the terms of the Receivables Purchase Agreement (the "RPA") between the Bank and Vinex Global, LLC ("Vinex"). With respect to your claim that the RPA may not be enforceable without the Bank's signature, we direct you to Section 13 of the RPA. The last sentence of that paragraph provides as follows: "Notwithstanding anything to the contrary contained herein, the payment of a purchase price or any other advance by [the Bank] to [Vinex] shall constitute [the Bank's] affirmative consent and agreement to the terms and conditions set forth in [the RPA], without the requirement that [the Bank] execute [the RPA]." So the



EXHIBIT

H

LAW OFFICES OF

# SHER GARNER CAHILL RICHTER
# KLEIN & HILBERT, L.L.C.

December 17, 2015
Page - 2 -

enforceability of the RPA is not dependent on a representative of the Bank signing the RPA.

You then assert that the assignment only applies to accounts listed on an Accounts Transmittal pursuant to Section 2.1.1 of the RPA. This erroneous interpretation ignores the distinction set forth in the RPA between "Purchased Accounts" and non-purchased "Accounts." The Accounts Transmittal set forth Section 2.1.1 of the RPA is the mechanism by which Vinex would offer certain Accounts *for sale* to the Bank. But the payment rights to all Accounts, whether purchased by the Bank or not, are assigned by Vinex to the Bank as set forth in Section 8.7 of the ROA. It would not matter whether this particular Invoice #1289 was actually purchased by the Bank. The invoice remains payable to the Bank regardless of whether it was offered to, or purchased by, the Bank.

Your letter then recites the general rule that an assignee of accounts is subject to all defenses that the account debtor may have against the assignor. You incorrectly, however, list Section 9-403 as the only exception to that general rule. Indeed, the Bank has never asserted the existence of any agreement between Designed Conveyor Systems, LLC ("DCS"), as account debtor, and Vinex, as assignor, not to assert defenses against the Bank, as assignee. Rather, the Bank has always relied on the exception set forth in Section 9-404 of the UCC. Under Section 9-404, the Bank is subject to all claims and defenses of the account debtor "unless an account debtor has made an enforceable agreement not to assert defenses or claims." We again direct your attention to the verification letter dated September 3, 2015 (the "Verification Letter"), a copy of which is attached hereto for your reference. By executing the Verification Letter, DCS acknowledged that Invoice No. 1289 was due in the amount indicated, "free of **any defense, off-set, counterclaim, recoupment or any other limitation** (emphasis added)." The waiver by DCS clearly complies with the requirements of Section 9-404 of the UCC and could not be any clearer.

In response to your claim that the assignment by of the accounts by Vinex to the Bank may have been prohibited under the contract between Vinex and DCS, we direct your attention to Section 9-406(d) of the UCC which prohibits such anti-assignment clauses. Any provision in the contract between Vinex and DCS prohibiting the assignment by Vinex of the accounts receivable owed by DCS is invalid under the UCC.

By this letter, the Bank reiterates its formal demand for payment of the outstanding balance of Invoice No. 1289 in accordance with the terms set forth in our prior correspondence. As you can imagine, the Bank is frustrated by DCS's efforts to disclaim any liability with respect to an invoice that it has expressly agreed, in writing, to pay. If the full amount due under Invoice No. 1289 is not paid within five (5) business days following the date of this letter, the Bank

LAW OFFICES OF

# SHER GARNER CAHILL RICHTER
# KLEIN & HILBERT, L.L.C.

December 17, 2015
Page - 3 -

reserves its rights to exercise any and all rights and remedies available to it under applicable law.

If you have any questions concerning the foregoing, please feel free to contact either myself or Ms. Minaxi Chase, the Vice President of Gulf Coast Business Credit.

Sincerely,

Chad P. Morrow

cc:    Ms. Minaxi Chase (via email)